WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth (DW-9618)
dwollmuth@wmd-law.com
Frederick R. Kessler (FK-8168)
fkessler@wmd-law.com
One Gateway Center
Newark, NJ 07102
(973) 733-9200

Attorneys for Plaintiff

[Additional Counsel on Signature Page]



RECEIVED
MAY 0 2 2014
AT 8:30 _____ M
WILLIAM T. WALSH, CLERK

RECEIVED
FEB 2 5 2014
AT 8:30
WILLIAM T. WALSH, CLERK ___ M

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DENNIS PALKON, Derivatively on Behalf of WYNDHAM WORLDWIDE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN P. HOLMES, ERIC A. DANZIGER,  SCOTT G. MCLESTER, JAMES E. BUCKMAN, MICHAEL H. WARGOTZ, GEORGE HERRERA, PAULINE D.E. RICHARDS, MYRA J. BIBLOWIT, BRIAN MULRONEY, STEVEN A. RUDNITSKY, and DOES 1-10, <br><br> Defendants, <br> -and- <br><br> WYNDHAM WORLDWIDE CORPORATION, a Delaware corporation, <br><br> Nominal Defendant. | Case No.: <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Dennis Palkon, located at 5051 Oley Turnpike Road, Reading, Pennsylvania, by his attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a verified shareholder derivative action by plaintiff on behalf of nominal

defendant Wyndham Worldwide Corporation ("WWC" or the "Company") against certain of its officers and members of its Board of Directors (the "Board").  This action seeks to remedy defendants' violations of law, breaches of fiduciary duties, and waste of corporate assets that have caused substantial damages to the Company.  Plaintiff has made a litigation demand upon WWC's Board.  As set forth below, the Board wrongfully refused plaintiff's demand.

2.      WWC is one of the world's largest hospitality companies.  As part of their normal business practices, WWC and its subsidiaries routinely collect their customers' personal and financial information, including payment card account numbers, expiration dates, and security codes.  WWC and its subsidiaries assure their customers that they will protect this sensitive private information.  However, as explained below, WWC failed to live up to this promise.

3.      This action arises out of the Individual Defendants' (as defined herein) responsibility for ***three*** separate data breaches.  In violation of their express promise to do so, and contrary to reasonable customer expectations, WWC and its subsidiaries failed to take reasonable steps to maintain their customers' personal and financial information in a secure manner.  As a result of WWC's complete and utter lack of appropriate security measures, thieves were able to steal sensitive personal and financial data from over ***619,000*** of the Company's customers.  For many of these victims, identity thieves have already utilized their personal information to commit fraud and other crimes.  For hundreds of thousands of others, constant vigilance of their financial and personal records will be required to protect themselves from the threat of having their identities stolen.

4.      ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Among other things, the Individual Defendants failed to ensure that the Company and its subsidiaries implemented adequate information security policies and procedures (such as by employing firewalls) prior to connecting their local computer networks to other computer networks,. Additionally, the Company's property management system server used an operating system so out of date that WWC's vendor stopped providing security updates for the operating system more than *three years* prior to the intrusions. Further, the Individual Defendants allowed the Company's software to be configured inappropriately, resulting in the storage of payment card information in clear readable text. These deficiencies, taken together, unreasonably and unnecessarily exposed consumers' personal data to unauthorized access and theft.

5.     The Individual Defendants aggravated the damage to the Company from the data breaches by failing to timely disclose the breaches in the Company's financial filings. The first time WWC mentioned any of the three data breaches in a financial filing was on July 25, 2012, over *two-and-a-half years* after the third breach had occurred. One week after this untimely disclosure, on August 1, 2012, the U.S. Securities and Exchange Commission ("SEC") sent a comment letter demanding that WWC timely disclose such incidents in future filings.

6.     The defendants' failures to implement appropriate internal controls at WWC designed to detect and prevent repetitive data breaches have severely damaged WWC. The Company is currently a defendant in a lawsuit filed by the Federal Trade Commission ("FTC") alleging unfairness and deception-based violations of section 5 of the Federal Trade Commission Act ("FTC Act") (the "FTC Action"). ███████████████████████

████████████████████████████ The FTC Action poses the risk of tens of millions of dollars in further damages to the Company. Moreover, WWC's failure to protect its

customers' personal and financial information has damaged its reputation with its customer base.

7.     Upon learning of these events, plaintiff sent a letter to WWC's Board demanding that the Board "take all necessary steps to investigate, address, and promptly remedy the harm inflicted upon [WWC]."  The Board consciously disregarded its duty to conduct a reasonable investigation upon receipt of a shareholder demand and refused to conduct any independent investigation whatsoever of the demand's allegations.  The Board refused plaintiff's demand based on the advice of conflicted counsel who could not, and did not, objectively evaluate the demand's allegations.  Because the Board failed to act in good faith and with due care (on the basis of a reasonable investigation), its decision to refuse plaintiff's demand was wrongful and is not protected by the business judgment rule.

8.     Plaintiff now brings this litigation on behalf of WWC to rectify the conduct of the individuals bearing ultimate responsibility for the Company's misconduct – the directors and senior management.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) WWC maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to WWC occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Dennis Palkon was a shareholder of WWC at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current WWC shareholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

13.     Nominal defendant WWC is a Delaware corporation with principal executive offices located at 22 Sylvan Way, Parsippany, New Jersey.  Accordingly, WWC is a citizen of Delaware and New Jersey.  WWC is one of the world's largest hospitality companies, offering individual consumers and business customers a broad array of hospitality services and products across various accommodation alternatives through its portfolio of world-renowned brands. WWC operates through multiple subsidiaries which are grouped into three segments: vacation exchange and rentals, vacation ownership, and lodging.  WWC's lodging business is conducted through its subsidiary, Wyndham Hotel Group, LLC ("Hotel Group"), and Hotel Group's subsidiaries including Wyndham Hotels and Resorts Inc. ("Hotels and Resorts") and Wyndham Hotel Management Inc. ("Hotel Management").  Hotel Group franchises and manages more than

7,000 hotels under fifteen hotel brands.

**Defendants**

14.     Defendant Stephen P. Holmes ("Holmes") is WWC's Chief Executive Officer ("CEO") and Chairman of the Board and has been since July 2006 and a director and has been since May 2003.  Defendant Holmes knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) improperly refused plaintiff's litigation demand.  Defendant Holmes was at least grossly negligent in ignoring glaring red flags concerning the Company's deficient security measures after the first two data breaches.  WWC paid defendant Holmes the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2012 | $1,235,305 | $4,500,000 | $1,500,000 | $3,458,855 | $1,428,369 | $12,122,529 |
| 2011 | $1,164,856 | $4,125,000 | $1,375,000 | $3,494,568 | $506,765 | $10,666,189 |
| 2010 | $1,115,050 | $3,750,000 | $1,250,000 | $2,984,991 | $398,076 | $9,498,117 |
| 2009 | $1,085,011 | $922,500 | $1,010,000 | $2,712,528 | $365,762 | $6,095,801 |
| 2008 | $1,076,355 | $1,250,000 | $3,750,000 | - | $222,462 | $6,298,817 |

Defendant Holmes is a citizen of New Jersey.

15.     Defendant Eric A. Danziger ("Danziger") is WWC's President and CEO of Hotel Group and has been since December 2008.  Defendant Danziger knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to protect customers' personal and financial information; and (ii) caused or allowed the Company to conceal its data breaches from investors.  Defendant Danziger was at least grossly negligent in ignoring glaring red flags concerning the Company's deficient security measures after the first two data breaches.  WWC paid defendant Danziger the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2012 | $554,820 | $2,000,000 | - | $818,360 | $258,595 | $3,631,775 |
| 2011 | $528,966 | $1,800,000 | - | $793,449 | $178,644 | $3,301,059 |
| 2010 | $509,696 | $1,500,000 | - | $637,120 | $113,091 | $2,759,907 |
| 2009 | $500,009 | $750,000 | - | $368,756 | $143,444 | $1,762,209 |
| 2008 | $28,847 | $562,500 | $187,500 | - | - | $778,847 |

Defendant Danziger is a citizen of Arizona.

16.     Defendant Scott G. McLester ("McLester") is WWC's Executive Vice President and General Counsel and has been since July 2006.  Defendant McLester knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) breached his duty of care and loyalty by conducting an improper investigation of plaintiff's litigation demand.  Defendant McLester was at least grossly negligent in ignoring glaring red flags concerning the Company's deficient security measures after the first two data breaches.  Defendant McLester is a citizen of New Jersey.

17.     Defendant James E. Buckman ("Buckman") is WWC's Lead Director and has been since March 2010 and a director and has been since May 2003.  Defendant Buckman knowingly or recklessly: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) improperly refused plaintiff's litigation demand.  WWC paid defendant Buckman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $142,611 | $217,404 | $39,431 | $399,446 |
| 2011 | $132,566 | $132,429 | $17,253 | $282,248 |
| 2010 | $93,429 | $93,314 | $16,928 | $203,671 |
| 2009 | $79,021 | $78,975 | $10 | $158,006 |
| 2008 | $79,028 | $78,984 | $15 | $158,027 |

Defendant Buckman is a citizen of New York.

18.    Defendant Michael H. Wargotz ("Wargotz") is a WWC director and has been since July 2006.  Defendant Wargotz is also Chairman of WWC's Audit Committee and has been since at least March 2007.  Defendant Wargotz knowingly or recklessly: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) improperly refused plaintiff's litigation demand.  WWC paid defendant Wargotz the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $137,635 | $212,353 | $37,659 | $387,647 |
| 2011 | $127,550 | $127,432 | $23,092 | $278,074 |
| 2010 | $96,549 | $96,446 | $21,507 | $214,502 |
| 2009 | $89,023 | $88,974 | $24 | $178,021 |
| 2008 | $89,047 | $88,972 | $23 | $178,042 |

Defendant Wargotz is a citizen of New York.

19.    Defendant George Herrera ("Herrera") is a WWC director and has been since July 2006.  Defendant Herrera is also a member of WWC's Audit Committee and has been since at least March 2007.  Defendant Herrera knowingly or recklessly: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) improperly refused plaintiff's litigation demand.  WWC paid defendant Herrera the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $132,575 | $207,404 | $34,407 | $374,386 |
| 2011 | $122,581 | $122,436 | $18,545 | $263,562 |
| 2010 | $92,549 | $92,434 | $14,178 | $199,161 |
| 2009 | $85,018 | $84,979 | $10 | $170,007 |
| 2008 | $85,048 | $84,974 | $8,359 | $178,381 |

Defendant Herrera is a citizen of Virginia.

20.     Defendant Pauline D.E. Richards ("Richards") is a WWC director and has been since July 2006.  Defendant Richards is also a member of WWC's Audit Committee and has been since at least March 2007.  Defendant Richards knowingly or recklessly: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) improperly refused plaintiff's litigation demand.  WWC paid defendant Richards the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $127,599 | $202,405 | $44,713 | $374,717 |
| 2011 | $117,553 | $117,439 | $37,728 | $272,720 |
| 2010 | $88,818 | $88,685 | $29,147 | $206,650 |
| 2009 | $83,773 | $83,714 | $3,030 | $170,517 |
| 2008 | $83,801 | $83,701 | $10 | $167,512 |

Defendant Richards is a citizen of Bermuda.

21.     Defendant Myra J. Biblowit ("Biblowit") is a WWC director and has been since July 2006.  Defendant Biblowit knowingly or recklessly: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) improperly refused plaintiff's litigation demand.  WWC paid defendant Biblowit the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $123,837 | $198,687 | $34,702 | $357,226 |
| 2011 | $113,817 | $113,677 | $48,595 | $276,089 |
| 2010 | $86,295 | $86,198 | $40,771 | $213,264 |
| 2009 | $81,258 | $81,227 | $9,316 | $171,801 |
| 2008 | $81,319 | $81,208 | $8,383 | $170,910 |

Defendant Biblowit is a citizen of New York.

22.     Defendant Brian Mulroney ("Mulroney") is a WWC director and has been since

- 9 -

July 2006.  Defendant Mulroney knowingly or recklessly: (i) failed to implement a system of internal controls to protect customers' personal and financial information; (ii) caused or allowed the Company to conceal its data breaches from investors; and (iii) improperly refused plaintiff's litigation demand.  WWC paid defendant Mulroney the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $131,305 | $206,180 | $77,800 | $415,285 |
| 2011 | $121,342 | $121,172 | $57,926 | $300,440 |
| 2010 | $92,549 | $92,434 | $50,100 | $235,083 |
| 2009 | $85,019 | $84,979 | $8,913 | $178,911 |
| 2008 | - | $170,006 | $2,007 | $172,013 |

Defendant Mulroney is a citizen of Canada.

23.     Defendant Steven A. Rudnitsky ("Rudnitsky") was WWC's President and CEO of Hotel Group from July 2006 to September 2008.  Defendant Rudnitsky knowingly, recklessly, or with gross negligence: (i) failed to implement a system of internal controls to protect customers' personal and financial information; and (ii) caused or allowed the Company to conceal its data breaches from investors.  Defendant Rudnitsky was at least grossly negligent in ignoring glaring red flags concerning the Company's deficient security measures after the first two data breaches.  WWC paid defendant Rudnitsky the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2008 | $412,125 | $1,460,435 | $709,036 | $2,255,021 | $4,836,617 |

Defendant Rudnitsky is a citizen of New Jersey.

24.     Doe Defendants 1-10 are sued herein under fictitious names for the reason that their true names and identities are presently unknown to plaintiff except that they are officers and employees of WWC or its subsidiaries.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the damages suffered by the Company.  Plaintiff will seek to amend this Complaint and include these Doe Defendants' true names and

capacities when they are ascertained.

25.     The defendants identified in ¶¶14-16, 23, and Doe Defendants 1-10 described in ¶24 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14, 17-22 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18-20 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶14-23, and Doe Defendants 1-10 described in ¶24, are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe WWC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage WWC in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of WWC and not in furtherance of their personal interest or benefit.

27.     To discharge their duties, the officers and directors of WWC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of WWC were required to, among other things:

(a)     devise and maintain a system of internal controls sufficient to ensure that the Company's customers' personal and financial information is protected;

(b)     ensure that the Company timely and accurately informed investors regarding any material data breach;

(c)     conduct the affairs of the Company in an efficient, business-like manner in

- 11 -

compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how WWC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices.

**Breaches of Duties**

28.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of WWC, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

29.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of WWC, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, WWC has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

30.    In addition to the general duties discussed above, under its Charter, which has been in place since at least October 2008, the Audit Committee Defendants, defendants Wargotz, Herrera, and Richards, owed specific duties to WWC to assist the Board in overseeing "the integrity of the Company's financial statements" and "the Company's systems of disclosure

- 12 -

controls and procedures, and internal controls over financial reporting."  Moreover, the Audit Committee's Charter provides that defendants Wargotz, Herrera, and Richards owed duties to WWC to oversee and monitor "the Company's compliance with legal and regulatory requirements."  The Audit Committee met fifteen times in 2008 and 2009, fourteen times in 2010, eleven times in 2011, and nine times in 2012.  As a result of these meetings and their duties pursuant to the Audit Committee Charter, the Audit Committee Defendants knew or recklessly disregarded that: (i) WWC's financial statements concealed the Company's data breach issues; and (ii) WWC lacked appropriate security measures to avoid continuing data breaches.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

32.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants failed to timely and accurately inform investors regarding the full scope of the data breaches.

33.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and waste of corporate assets; and to conceal adverse information concerning the Company's operations.

34.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by allowing the Company to purposefully or recklessly

conceal the data breaches affecting over 619,000 customers.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

35.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND OF THE COMPANY AND ITS PRIVACY POLICY

36.    WWC is a hospitality business that, through its subsidiaries, franchises and manages hotels and sells timeshares.  The Company conducts its business through three subsidiaries, including Hotel Group.  Hotel Group's wholly-owned subsidiaries, Hotels and Resorts and Hotel Management, licensed the Wyndham brand name to approximately ninety independently-owned hotels under franchise or management agreements (collectively hereinafter "Wyndham-branded hotels").

37.    Hotels and Resorts operates a website where consumers can make reservations at any Wyndham-branded hotel.  In addition, some Wyndham-branded hotels operate their own individual websites, which describe the individual hotel and its amenities.  Customers making reservations from a Wyndham-branded hotel's individual website are directed back to Hotels and Resorts' website to make the reservation.

38.    Hotels and Resorts routinely disseminated, or caused to be disseminated, privacy policies or statements on its website to their customers and potential customers.  Hotels and

Resorts promises the Company's customers, among other things, to "*safeguard [their] personally identifiable information by using standard industry practices*."

**Identity Theft Is a Severe Problem that Has Become a Focus of the U.S. Government**

39.     Notwithstanding its promise and duties to protect its customers' sensitive personal and financial information, WWC allowed the sensitive and private information of hundreds of thousands of its customers to be stolen.  WWC's failure to protect its customers' sensitive personal and financial information exposes victims to identity theft.  Identity theft occurs when someone wrongfully obtains another's personal information without their knowledge to commit theft or fraud.

40.     Armed with a person's personal and financial information, identity thieves can encode the victim's account information onto a different card with a magnetic strip creating a counterfeit card that can be used to make fraudulent purchases.  With the addition of a victim's personal identification number, a thief can use the counterfeit card to withdraw money from that person's bank account.

41.     Identity thieves can cause further damage to their victims by using personal information to open new credit and utility accounts, receive medical treatment on their health insurance, or even obtain a driver's license. Once a person's identity has been stolen, reporting, identifying, monitoring, and repairing the victim's credit is a cumbersome, expensive, and time-consuming process.  In addition to the frustration of having to identify and close affected accounts, correct information in their credit reports, victims of identity theft often incur costs associated with defending themselves against civil litigation brought by creditors.  Victims also suffer the burden of having difficulty obtaining new credit.  Moreover, victims of identity theft must monitor their credit reports for future inaccuracies as fraudulent use of stolen personal information may persist for several years.

42.     Annual monetary losses from identity theft are in the billions of dollars. According to The President's Identity Theft Task Force Report dated April 2007, on a strategic plan to combat identity theft:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, ... individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit.  Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

43.     The significant impact identity theft and the failure to secure personal information can cause has led to the enactment of numerous privacy-related laws aimed toward protecting consumer information and disclosure requirements, including, for example: (i) FTC Act, 15 U.S.C. §§41-58; (ii) Fair Credit Reporting Act; (iii) Fair and Accurate Credit Transactions Act; (iv) Gramm-Leach-Bliley Act; (v) Driver's Privacy Protection Act; (vi) Health Insurance Portability and Accountability Act; (vii) The Privacy Act of 1974; (viii) Social Security Act Amendments of 1990; (ix) E-Government Act of 2002; and (x) Federal Information Security Management Act of 2002.

44.     The Individual Defendants were fully aware of the ramifications of failing to keep customers' data secure and knew that the Company could be subject to costly government enforcement actions and private litigation.  As stated in the risk disclosures in the Company's Annual Report on Form 10-K filed with the SEC on February 15, 2013:

> In connection with our business, we and our service providers collect and retain large volumes of certain types of personally identifiable and other information

pertaining to our customers, stockholders and employees. Such information includes but is not limited to large volumes of customer credit and payment card information. The legal, regulatory and contractual environment surrounding information security and privacy is constantly evolving and *the hospitality industry is under increasing attack by cyber-criminals* in the U.S. and other jurisdictions in which we operate. *A significant actual or potential theft, loss, fraudulent use or misuse of customer, stockholder, employee or our data by cybercrime or otherwise, non-compliance with our contractual or other legal obligations regarding such data or a violation of our privacy and security policies with respect to such data could adversely impact our reputation and could result in significant costs, fines, litigation or regulatory action against us*.

### THE INDIVIDUAL DEFENDANTS' FAILURE TO PROTECT CUSTOMERS' INFORMATION LEADS TO THREE SEPARATE DATA BREACHES

45.     Despite the severe ramifications of failing to keep customers' data secure, between April 2008 and January 2010, the Individual Defendants caused or allowed WWC to suffer from three separate data breaches.  In particular, intruders were able to gain unauthorized access to Hotels and Resorts' computer network, including the Wyndham-branded hotels' property management systems.  The intruders used similar techniques on each of the three separate data breaches to access personal information stored on the Wyndham-branded hotels' property management system servers, including customers' payment card account numbers, expiration dates, and security codes.  After discovering each of the first two breaches, the Individual Defendants failed to take appropriate steps in a reasonable time frame to prevent the further compromise of the Hotels and Resorts' network.

**The First Breach**

46.     In April 2008, intruders first gained access to a Phoenix, Arizona, Wyndham-branded hotel's local computer network.  The hotel's local network was also connected to Hotels and Resorts' network through the hotel's property management system.  Using this access, in May 2008, the intruders attempted to compromise an administrator account on the Hotels and Resorts' network by guessing multiple user IDs and passwords – known as a brute force attack.

47.     This brute force attack caused multiple user account lockouts over several days, including one instance in which 212 user accounts were locked out, before the intruders were ultimately successful.  Account lockouts occur when a user inputs an incorrect password multiple times, and are a well-known warning sign that a computer network is being attacked.  WWC did not have an adequate inventory of the Wyndham-branded hotels' computers connected to its network, and, therefore, although the Company was able to determine that the account lockouts were coming from two computers on Hotels and Resorts' network, it was unable to physically locate those computers.  As a result, WWC did not determine that the Hotels and Resorts' network had been compromised until almost *four months* later.

48.     The intruders' brute force attack led to the compromise of an administrator account on the Hotels and Resorts' network.  Because WWC did not appropriately limit access between and among the Wyndham-branded hotels' property management systems, the Hotels and Resorts' own corporate network, and the Internet – such as through the use of firewalls – once the intruders had access to the administrator account, they were able to gain unfettered access to the property management system servers of a number of Wyndham branded hotels.

49.     Additionally, the Phoenix, Arizona, hotel's property management system server was using an operating system that its vendor had stopped supporting, including providing security updates and patch distribution, more than three years prior to the intrusion.  The Individual Defendants knew or recklessly disregarded that the hotel was using this unsupported and insecure server, yet continued to allow it to connect to Hotels and Resorts' computer network.

50.     In this first breach, the intruders installed memory-scraping malware on numerous Wyndham-branded hotels' property management system servers, thereby accessing payment card

data associated with the authorization of payment card transactions that was present temporarily on the hotels' servers. In addition, the intruders located files on some of the Wyndham-branded hotels' property management system servers that contained payment card account information for large numbers of consumers, stored in clear readable text. These files were created and stored in clear text because WWC had allowed the property management systems to be configured inappropriately to create these files and store the payment card information that way.

51.     As a result of WWC's complete and utter lack of reasonable data security practices, intruders were able to gain unauthorized access to the Hotels and Resorts' corporate network, and the property management system servers of forty-one Wyndham-branded hotels – twelve managed by Hotel Management and twenty-nine franchisees of Hotels and Resorts. This resulted in the compromise of more than **500,000** payment card accounts, and the export of hundreds of thousands of consumers' payment card account numbers to a domain registered in Russia.

**The Second Breach**

52.     In March 2009, approximately six months after the Individual Defendants discovered the first breach, intruders were able again to gain unauthorized access to the Hotels and Resorts' network. This time, the intruders gained access to the network through a service provider's administrator account in the Phoenix, Arizona, data center. The Company, however, did not immediately learn about the breach due to its faulty security controls.

53.     In May 2009, WWC learned that several Wyndham-branded hotels had received complaints from consumers about fraudulent charges made to their payment card accounts after using those cards to pay for stays at Wyndham-branded hotels. At that point, the Company searched Hotels and Resorts' network for the memory-scraping malware used in the previous attack, and found it on the property management system servers of more than thirty Wyndham-

branded hotels.  As a result of WWC's failure to monitor Hotels and Resorts' network for the malware used in the previous attack, hackers had unauthorized access to the Hotels and Resorts' network for approximately two months.

54.     In addition to again using memory-scraping malware to access personal information, in this second breach, the intruders reconfigured software at the Wyndham-branded hotels to cause their property management systems to create clear text files containing the payment card account numbers of guests using their payment cards at the hotels.

55.     Ultimately, the intruders exploited the Company's data security vulnerabilities to gain access to the Hotels and Resorts' network and the property management system servers of thirty-nine Wyndham-branded hotels – nine of which were managed by Hotel Management and thirty franchisees of Hotels and Resorts.  In this second incident, the intruders were able to access information for more than *50,000* consumer payment card accounts and use that information to make fraudulent charges on consumers' accounts.

**The Third Breach**

56.     In late 2009, intruders again compromised an administrator account on Hotels and Resorts' network.  Because WWC had still not adequately limited access between and among the Wyndham-branded hotels' property management systems, Hotels and Resorts' corporate network, and the Internet – such as through the use of firewalls – once the intruders had access to this administrator account, they were able again to access multiple Wyndham-branded hotels' property management system servers.   As in the previous attacks, the intruders installed memory-scraping malware to access payment card account information held at the Wyndham-branded hotels.

57.     Again, WWC did not detect this intrusion itself, but rather learned of the breach from a credit card issuer.  The credit card issuer contacted WWC in January 2010, and indicated

that the account numbers of credit cards it had issued were used fraudulently shortly after its customers used their credit cards to pay for stays at Wyndham-branded hotels.

58.     As a result of WWC's security failures, in this instance, intruders compromised Hotels and Resorts' corporate network and the property management system servers of twenty-eight Wyndham-branded hotels – eight managed by Hotel Management and twenty franchisees of Hotels and Resorts.   As a result of this third incident, the intruders were able to access information for approximately **69,000** consumer payment card accounts and again make fraudulent purchases on those accounts.   In total, the three data breaches affected more than **619,000** of the Company's customers.

**FTC Investigation and Resulting Lawsuit**

59.     ███████████████████████████████████████████

███████████████   ████████████████████████████████

███████████████████████████████████████████████

██████████

60.     Over two years later, on June 26, 2012, the FTC filed a lawsuit against WWC and three of its subsidiaries in connection with the three data breaches.   The FTC's complaint charges that WWC's security practices were unfair and deceptive in violation of the FTC Act.   According to the FTC, WWC failed to remedy known security vulnerabilities, employ reasonable measures to detect unauthorized access, and follow proper incident response procedures following the first breach in April 2008.   Thus, the Company remained vulnerable to attacks that took place the following year.

61.     As further detailed below, the Individual Defendants kept the three data breaches, the FTC investigation, and the FTC Action hidden from the Company's shareholders.

**The Individual Defendants Knew or Should Have Known that the Company's Customers Were Vulnerable to Attack Yet Failed to Implement Appropriate Security Measures**

62.     WWC recognizes that its customers' personal and financial information is highly sensitive and must be protected.  Moreover, as discussed above, WWC promises its customers that it will "maintain 'fire walls' and other appropriate safeguards to ensure" customers' information.  WWC and its subsidiaries' Privacy Policy, revised as of October 2008, states:

> *We recognize the importance of protecting the privacy of individual-specific (personally identifiable) information collected about guests, callers to our central reservation centers, visitors to our Web sites, and members participating in our Loyalty Program (collectively, "Customers").*
>
> \* \* \*
>
> This Policy applies to residents of the United States, hotels of our Brands located in the United States, and Loyalty Program activities in the United States only.
>
> \* \* \*
>
> *We safeguard our Customers' personally identifiable information by using standard industry practices*.  Although "guaranteed security" does not exist on or off the Internet, we make commercially reasonable efforts to make our collection of such Information consistent with all applicable laws and regulations.
>
> \* \* \*
>
> We take commercially reasonable efforts to create and maintain "fire walls" and other appropriate safeguards to ensure that to the extent we control the Information, the Information is used only as authorized by us and consistent with this Policy, and that the Information is not improperly altered or destroyed.[1]

63.     ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[1] There is a link to the privacy policy on each page of the Hotels and Resorts' website, including its reservations page.

- 22 -



64.     Despite being confronted with the Company's blatantly inadequate security measures, the Individual Defendants failed to implement a system that would provide reasonable and appropriate security for the personal information collected and maintained by Hotels and Resorts, Hotel Management, and the Wyndham-branded hotels.  The Individual Defendants caused or allowed the Company to engage in a number of practices that, taken together, unreasonably and unnecessarily exposed consumers' personal data to unauthorized access and theft.  Among other things, the Individual Defendants:

(a)     failed to employ reasonable measures to detect and prevent unauthorized access to the computer networks of the Company, its subsidiaries, and its branded hotels or to conduct security investigations;

(b)     failed to implement proper incident response procedures, including monitoring Hotels and Resorts' computer network for malware used in previous intrusions;

(c)     allowed WWC to operate with out-of-date operating systems and security measures;

(d)   failed to remedy known security vulnerabilities on Wyndham-branded hotels' servers that were connected to Hotels and Resorts' computer network, thereby putting personal information held by Wyndham-branded hotels at risk.   For example, the Company permitted Wyndham-branded hotels to connect insecure servers to the Hotels and Resorts' network, including servers using outdated operating systems that could not receive security updates or patches to address known security vulnerabilities;

(e)   failed to use readily available and widely used security measures to limit access between and among the Wyndham-branded hotels' property management systems, the Hotels and Resorts' corporate network, and the Internet, including such basic measures as employing firewalls; and

(f)   failed to require WWC to employ commonly-used methods to require user IDs and passwords that are difficult for hackers to guess.   The Company did not require the use of complex passwords for access to the Wyndham-branded hotels' property management systems and allowed the use of easily guessed passwords.   For example, to allow remote access to a hotel's property management system, which was developed by software developer Micros Systems, Inc., the Company used the phrase "micros" as both the user ID and the password.

65.   The Individual Defendants knew or should have known that the Company's deficient security systems and unreasonably vulnerable technologies would cause third parties to attack these systems and to obtain access to the data provided by its Customers.   The Individual Defendants, however, failed to take corrective measures to update the systems and technologies of the Company and its subsidiaries.

### THE INDIVIDUAL DEFENDANTS' FAILURE TO TIMELY DISCLOSE THE THREE DATA BREACHES LEADS TO SEC INTERVENTION

66.   The Individual Defendants caused or allowed the Company to conceal its data

breach issues from shareholders. The first time WWC mentioned any of the three data breaches was in the Company's Quarterly Report on Form 10-Q filed with the SEC on July 25, 2012, when it announced the filing of the FTC Action. The Form 10-Q stated:

> On June 26, 2012, the U.S. Federal Trade Commission ("FTC") filed a lawsuit in Federal District Court for the District of Arizona against the Company and its subsidiaries, Wyndham Hotel Group, LLC, Wyndham Hotels & Resorts Inc. and Wyndham Hotel Management Inc., alleging unfairness and deception-based violations of Section 5 of the FTC Act in connection with three prior data breach incidents involving a group of Wyndham brand hotels.

67. One week after this disclosure regarding the "three prior data breach incidents," on August 1, 2012, the SEC sent a comment letter demanding WWC to timely disclose such incidents in future filings "in order to provide proper context for the [Company's] risk factor disclosure." The SEC comment letter stated:

> We note you disclose that you and your service providers collect and retain significant volumes of certain types of personally identifiable and other information pertaining to your customers, stockholders and employees and that a significant actual or potential theft, loss, fraudulent use or misuse of customer, stockholder, employee or your data by cybercrime or otherwise could adversely impact your reputation and could result in significant costs, fines, litigation or regulatory action against you. *We note the disclosure in your latest Form 10-Q referencing "three prior data breach incidents involving a group of Wyndham brand hotels." Beginning with your next Form 10-Q, please state that you have experienced data breach incidents in the past in order to provide the proper context for your risk factor disclosure.* Please refer to the Division of Corporation Finance's Disclosure Guidance Topic No. 2 at http://www.sec.gov/divisions/corpfin/guidance/cfguidance-topic2.htm for additional information.

### DAMAGES TO WWC

68. As a result of the Individual Defendants' improprieties, thieves were able to steal sensitive personal and financial data from at least 619,000 WWC customers. WWC's failure to protect its customers' personal and financial information has damaged its reputation with its customer base. In addition to price, WWC's current and potential customers consider a company's ability to protect their personal and financial information when choosing where to

book their travel arrangements.  Customers are less likely to book at hotels that cannot be trusted to safeguard their sensitive private information.

69.     Further, as a direct and proximate result of the Individual Defendants' actions, WWC has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the pending FTC Action filed against the Company;

(b)     costs incurred from cooperating with the FTC investigation into the data breaches;

(c)     costs incurred from the Company's internal investigation into the data breaches, including, but not limited to, expense for legal, investigative, and consulting fees;

(d)     costs incurred from expenses and capital investments for remediation activities;

(e)     costs incurred from notifying customers, sorting improper charges from legitimate charges, and reimbursing customers for improper charges; and

(f)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to WWC.

## DERIVATIVE AND DEMAND ALLEGATIONS

70.     Plaintiff was a shareholder of WWC at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current WWC shareholder.

71.     Plaintiff brings this action derivatively in the right and for the benefit of WWC to redress injuries suffered, and to be suffered, by WWC as a direct result of the Individual Defendants' breaches of fiduciary duty.  WWC is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it

would not otherwise have.

72.   Plaintiff will adequately and fairly represent the interests of WWC in enforcing and prosecuting its rights.

73.   Plaintiff made a demand upon WWC's Board to investigate and remedy the violations of law described herein.  As set forth below, the Board did not act in good faith or with due care (on the basis of a reasonable investigation) in responding to plaintiff's demand. Accordingly, the Board's refusal of plaintiff's demand was wrongful and is not entitled to the protection of the business judgment rule.  Plaintiff, therefore, has the right to bring this action on WWC's behalf.

74.   On June 11, 2013, plaintiff, through his counsel, sent a letter to WWC's Board explaining that he was concerned with "the damages incurred by [WWC] due to the blatantly inadequate security measures instituted to protect its computer systems and its customers' personal information stored on those systems" (the "Litigation Demand").  In the Litigation Demand, plaintiff identified himself as a WWC shareholder and detailed that:

> [O]ver the past two years, intruders accessed the Company's and/or its subsidiaries' networks on three separate occasions.  In all three instances, hackers accessed the Company's consumer data through its Phoenix, Arizona, facility.  As a result, over 600,000 of the Company's customers had their payment card account information sent to a domain registered in Russia.  These security breaches led to fraudulent charges on these customer accounts worth over $10.5 million.

Plaintiff then demanded that an independent and disinterested committee of the Board investigate four matters: (i) which current or former Company employees, officers, and/or directors were responsible for overseeing the Company's internal controls concerning its protection of personal customer information; (ii) which current or former Company employees, officers, and/or directors were responsible for the violations of the FTC Act; (iii) which current or former Company employees, officers, and/or directors received reports of the previous security

- 27 -

breaches, yet still failed to act to safeguard personal customer information; and (iv) the extent of the damages incurred by WWC as a result of the foregoing.  A true and correct copy of the Litigation Demand is attached hereto as Exhibit A.

75.     On June 28, 2013, defendant McLester sent a letter responding to the Litigation Demand.  In his letter, defendant McLester stated that he had "provided [plaintiff's Litigation Demand] to [WWC's] Board, and it will be addressed by the Board in due course."  Further, he requested that plaintiff "provide sufficient information to confirm [plaintiff's] status as a [WWC] shareholder at the time the events underlying [the Litigation Demand] occurred and/or when you sent your demand letter."  Defendant McLester stated that "[w]ithout information sufficient to show that [plaintiff] was a [WWC] shareholder during the relevant time, we cannot conclude that he has standing to pursue a derivative demand."  Defendant McLester also noted that the Board had received a "virtually identical letter" from a different WWC shareholder in November 2012 (the "Previous Shareholder Demand") (together with plaintiffs' Litigation Demand, the "Litigation Demands").  A true and correct copy of defendant McLester's June 28, 2013 letter is attached hereto as Exhibit B.

76.     Defendant McLester's letter sdemonstrates that the Board had already prejudged the Litigation Demand and was only concerned with the potential liability it and management faced, not investigating the underlying facts of the Litigation Demand.  In particular, defendant McLester's pretextual demand that plaintiff provide documents showing that he held stock during the times of the data breaches in order to prove he has "standing" to pursue a demand is without legal basis.  As plaintiff explained in his July 3, 2013 letter responding to the June 28, 2013 letter, Delaware law has rejected the notion that a shareholder must "prove standing to pursue a derivative action at the time of making a demand." Rather, as plaintiff noted, defendant McLester

appeared to "conflate the standards for making a litigation demand upon a company with the requirements for a shareholder to have standing to sue derivatively."  Plaintiff stated that while he would not provide defendant McLester with the information he had requested, "[i]f at some time in the future you can articulate the relevance of providing the proof you requested to the Board, we will revisit our decision at that point."  A true and correct copy of plaintiff's July 3, 2013, letter is attached hereto as Exhibit C.

77.     Defendant McLester never attempted to articulate the relevance of this information.  Further, neither he nor the Board ever informed plaintiff that they requested this information because they had not been able to independently ascertain his status as a WWC shareholder, if that was the reason for their request.

78.     █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ ███████████████████████████

██████████████ ██████████████████████████████████████████

████████████████████████ ████████████████████████████████

███████████████████████████████████████████████████ █████

████████████████████████████████████████████████

79. ████████████████████████████████████

████████████████████████████████  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████  ████████████████████████

████████████████████████████████████████████████

██████████████████████

80. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████  ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



82.   Two weeks later, and after not responding to plaintiff's August 6, 2013 letter requesting defendant McLester provide an update on the status of the Board's investigation of the Litigation Demand, on August 20, 2013, defendant McLester sent a letter to plaintiff's counsel stating that "the Audit Committee and the Board have considered [the Litigation Demand] and have determined that it is not in the best interests of [WWC] to pursue the claims outlined in [the Litigation Demand] at this time" (the "Demand Refusal Letter").  The Demand Refusal Letter

stated that the Board refused plaintiff's Litigation Demand for the same reasons it had refused the Previous Shareholder Demand, and attached a copy of a letter dated March 15, 2013, that explained those reasons (the "March 15, 2013 Letter").[2]  The Demand Refusal Letter claimed that the Board's earlier decision was based on "a number of considerations" that "continue to apply and counsel against pursuing the claims outlined in [plaintiff's Litigation Demand]," including: (i) "[WWC] has strong defenses to the FTC's allegations"; (ii) "commencing litigation against allegedly responsible individuals would impair [WWC's] defenses in the FTC's lawsuit"; (iii) "the claims contemplated are not yet ripe"; (iv) "there has been no material damage to [WWC's] shareholders as a result of the FTC's lawsuit or the conduct at issue in that lawsuit"; and (v) "there would be significant legal barriers to the claims."  True and correct copies of the Demand Refusal Letter and the March 15, 2013 Letter are attached hereto as Exhibits D and E, respectively. ████████████████████████████████████████

████████████████████████  █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████  ████████████████████████████  █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[2] Plaintiff's counsel here also represented the shareholder that sent the Previous Shareholder Demand.

83. ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

84. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████

85. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

86.

87.

88.

89.

90.

91.

████████████████████████████████████████████████████████

████████████████████████    ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

92.     Plaintiff was unaware of the Board's failure to independently and in good faith consider his Litigation Demand until the Company agreed to provide him with certain documents in response to an inspection demand made pursuant 8 Delaware General Corporation Law Code section 220 (the "Inspection Demand").  In the Inspection Demand, plaintiff sought to inspect all Company documents relating to the Board's evaluation and refusal of his Litigation Demand ("Requests 1-5"), as well as documents reflecting any remedial measures taken by the Company relating to the allegations of the Litigation Demand ("Request 6") for the proper purpose of "evaluat[ing] the decision of the [Board] to reject [the Litigation Demand]."  Plaintiff's Inspection Demand was accompanied by a Verification stating under oath that plaintiff was a stockholder of WWC and attaching a copy of plaintiff's account statement, as required by Delaware law.  The Inspection Demand was addressed to, and received by, defendant Holmes on September 12, 2013.  A true and correct copy of the Inspection Demand is attached hereto as Exhibit G.

93.     On September 18, 2013, defendant McLester responded to the Inspection Demand letter and stated that WWC would "substantively respond to this inspection demand promptly after [reviewing] the matter with … counsel."  A true and correct copy of defendant McLester's September 18, 2013 letter, is attached hereto as Exhibit H.

94.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

95.

96.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████

97.     On October 16, 2013, plaintiff's counsel sent an e-mail responding to Lafferty's letter.  In the interests of avoiding needless delay, plaintiff's counsel stated that plaintiff would provide the Company with the additional account statements Lafferty had requested.  Plaintiff subsequently provided this information to the attorneys at Morris Nichols, and the parties negotiated a confidentiality agreement governing WWC's document production.

98.     On December 30, 2013, WWC sent plaintiff's counsel the documents that were purportedly responsive to Requests 1-5.  WWC's document production included ████████████

██████████████████████████████████████████████████████

█████████████████████████████████████

99.     ██   ████   ██████   ██████   ██████   ██████ █ ██████   ████   ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

100.    The next day, plaintiff's counsel sent an e-mail to Lafferty explaining that he was surprised to see that the Company's production did not include ████████████████

██████████████████████████████████████████████████████

████████████   Plaintiff's counsel noted that "[t]his is exactly the type of information that Delaware has held that the Company must provide to a shareholder," citing the Delaware Supreme Court decision, *Grimes v. DSC Communications Corp.*, 724 A.2d 561 (Del. Ch. 1998). ████████████

████████████████████████████████████████████

████████████ arguing that it was covered by the attorney-client privilege and demanding that plaintiff conduct a detailed analysis on the privilege exception before it was willing to provide him with the requested report.   Again, plaintiff's counsel disagreed, explaining via e-mail that it was black letter law that plaintiff was entitled to the requested document, this time citing *Louisiana Mun. Police Employees Ret. Sys. v. Morgan Stanley & Co. Inc.*, CIV.A. 5682-VCL, 2011 WL 773316 (Del. Ch. Mar. 4, 2011).   In response to plaintiff's counsel's e-mail, the Company agreed to produce the document.   It was only after reviewing all of these documents that plaintiff learned of the Board's failure to consider his Litigation Demand in good faith and with the requisite care.

101.   Plaintiff has not made any demand on the other shareholders of WWC to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   WWC is a publicly held company with over 130 million shares outstanding and thousands of shareholders;

(b)   making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)   making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants and Does 1-10 for Breach of Fiduciary Duty

102.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.   As alleged in detail herein, the Individual Defendants and Does 1-10, by reason of

their positions as officers and directors of WWC and because of their ability to control the business and corporate affairs of WWC, owed to WWC fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage WWC in a fair, just, honest, and equitable manner.

104.   The Officer Defendants and Does 1-10 breached their duties of care and loyalty by knowingly, recklessly, or with gross negligence: (i) failing to implement a system of internal controls to protect customers' personal and financial information; and (ii) causing or allowing the Company to conceal the data breaches from investors.

105.   The Director Defendants breached their duty of loyalty by knowingly or recklessly: (i) failing to implement a system of internal controls to protect customers' personal and financial information; and (ii) causing or allowing the Company to conceal the data breaches from investors.

106.   The Audit Committee Defendants breached their fiduciary duty of loyalty by: (i) failing to implement a system of internal controls to protect customers' personal and financial information; and (ii) causing or allowing the Company to conceal the data breaches from investors.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, as required by the Audit Committee Charter in effect at the time.

107.   The Director Defendants breached their fiduciary duties of care and loyalty by failing to act in good faith and on the basis of a reasonable investigation in responding to plaintiff's Litigation Demand.  The Director Defendants consciously disregarded their duties upon receipt of the Litigation Demand and wrongfully refused the Litigation Demand.

108.   As a direct and proximate result of the Individual Defendants' and Does 1-10's breaches of their fiduciary obligations, WWC has sustained significant damages, as alleged

herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

109.   Plaintiff, on behalf of WWC, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants and Does 1-10 for Waste of Corporate Assets

110.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.   As a result of the misconduct described above, the Individual Defendants and Does 1-10 wasted corporate assets: (i) by failing to properly consider the interests of the Company and its public shareholders; (ii) by failing to implement adequate internal controls to detect and prevent the breach of the Company's customers' personal and financial information; (iii) by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties; and (iv) ███████████████████████ ███████████████████████████████████ and potentially tens of millions of dollars in additional legal costs and/or legal liability arising from the unlawful actions.

112.   The Individual Defendants' failure to implement adequate internal controls to detect and prevent the breach of the Company's personal and financial information was not supported by any rational basis at the time of such failure.

113.   As a result of the waste of corporate assets, the Individual Defendants and Does 1-10 are liable to the Company.

114.   Plaintiff, on behalf of WWC, has no adequate remedy at law.

## COUNT III

### Against All Individual Defendants and Does 1-10 for Unjust Enrichment

115.   Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

116.   By their wrongful acts and omissions, the Individual Defendants and Does 1-10 were unjustly enriched at the expense of and to the detriment of WWC.   The Individual Defendants and Does 1-10 were unjustly enriched as a result of the compensation they received while breaching fiduciary duties owed to WWC.     It would be unjust for the Individual Defendants to retain this benefit.

117.   Plaintiff, as a shareholder and representative of WWC, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

118.   Plaintiff, on behalf of WWC, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of WWC, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing WWC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect WWC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations so that FTC rules and regulations are complied with;

2.      the creation of an officer-level position (that reports to the Board's Audit Committee) to monitor and implement new policies to ensure that the Company is complying with applicable rules and regulations and its information systems (including the security measures for those information systems) are appropriate and adequate;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

4.      a provision to permit the shareholders of WWC to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of WWC has an effective remedy;

D.      Awarding to WWC restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 25, 2014

/s/ Frederick R. Kessler

WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth (DW-9618)
dwollmuth@wmd-law.com
Frederick R. Kessler (FK-8168)
fkessler@wmd-law.com
One Gateway Center, 9th Floor
Newark, NJ 07102
(973) 733-9200
*Attorneys for Plaintiffs*

Of Counsel:

ROBBINS ARROYO LLP
Brian J. Robbins
Felipe J. Arroyo
Shane P. Sanders
Gina Stassi
600 B Street, Suite 1900
San Diego, CA 92101
(619) 525-3990

RYAN & MANISKAS, LLP
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
(484) 588-5516

928555

## VERIFICATION

I, Dennis Palkon, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: _2/19/14_

_Dennis Palkon_
Dennis Palkon

# Exhibit A



600 B Street, Suite 1900
San Diego, CA 92101
619.525.3990 *phone*
619.525.3991 *fax*
www.robbinsarroyo.com

June 11, 2013

**VIA UPS GROUND**

Board of Directors
WYNDHAM WORLDWIDE CORPORATION
22 Sylvan Way
Parsippany, NJ 07054

      Re:    *Wyndham Worldwide Corporation Shareholder Litigation Demand*

Dear Board of Directors:

I write on behalf of our client, Dennis Palkon, a shareholder of Wyndham Worldwide Corporation ("Wyndham" or the "Company") to demand the Company's Board of Directors (the "Board") investigate, address, remedy, and commence proceedings against certain individuals responsible for causing Wyndham to violate section 5(a) of the Federal Trade Commission ("FTC") Act, 15 U.S.C. §45(a). Our client is concerned about the damages incurred by Wyndham due to the blatantly inadequate security measures instituted to protect its computer systems and its customers' personal information stored on those systems. As you are undoubtedly aware, over the past two years, intruders accessed the Company's and/or its subsidiaries' networks on three separate occasions. In all three instances, hackers accessed the Company's consumer data through its Phoenix, Arizona, facility. As a result, over 600,000 of the Company's customers had their payment card account information sent to a domain registered in Russia. These security breaches led to fraudulent charges on these customer accounts worth over $10.5 million.

In addition to the harm done directly to the Company by the hackers, on June 26, 2012, the FTC sued the Company and a number of its subsidiaries directly. The FTC complaint alleges that the Company violated section 5(a) of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." The FTC complaint alleges that the Company falsely represented that it had implemented reasonable and appropriate measures to protect personal information against unauthorized access. In addition, the Company failed to employ reasonable and appropriate measures to protect personal information against unauthorized access.

**Damages Caused To Wyndham**

As a result of the FTC's lawsuit against Wyndham, the Company has been, and will continue to be, severely damaged and injured by certain of its fiduciaries' misconduct. Further, as a direct and proximate result of their conduct, Wyndham has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

      a)     costs incurred from having to hire specialists to investigate the Company's computer systems to search for any remaining programming left by the hackers;



*Wyndham Worldwide Corporation Shareholder Litigation Demand*
June 11, 2013
Page 2

     b)     any payment to customers, credit card companies, or others for the fraudulent charges;

     c)     damage to the Company's reputation and loss of business due to the Company's failure to implement adequate safety measure to protect personal information; and

     d)     costs incurred from compensation and benefits wrongly paid to individuals that breached their duties to the Company.

**Shareholder Demand**

Given the above, Mr. Palkon demands that the Board take all necessary steps to investigate, address, and promptly remedy the harm inflicted upon Wyndham as a result of the misconduct described herein. In particular, our client demands that the Board investigate the circumstances surrounding Wyndham's violations of the FTC Act. Accordingly, the Board must undertake an investigation of the wrongdoing detailed herein through a committee of the Board consisting of independent and disinterested directors with the assistance of independent outside legal counsel. The investigation should, among other things, be sufficient to determine:

     a)     which current or former Company employees, officers, and/or directors were responsible for overseeing the Company's internal controls concerning its protection of personal customer information;

     b)     which current or former Company employees, officers, and/or directors were responsible for the violations of the FTC Act;

     c)     which current or former Company employees, officers, and/or directors received reports of the previous security breaches, yet still failed to act to safeguard personal customer information; and

     d)     the extent of the damages incurred by Wyndham as a result of the foregoing.

Following the investigation, our client demands that the Company commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct described above. The legal proceedings should bring claims for breaches of fiduciary duty and indemnification and contribution, among other relevant and appropriate claims. The legal proceedings should also seek recovery of the salaries, bonuses, director remuneration, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. Due to the concern that the proceedings cannot be initiated prior to the expiration of the relevant statute of limitations, the Board should

secure tolling agreements from all potential defendants, which will allow the Board to complete its investigation and pursue all appropriate legal remedies. Moreover, to the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or obtaining tolling agreements, the Board must investigate and pursue claims for breaches of fiduciary duties and/or legal malpractice against those who allowed any statute of limitations periods to expire.

Finally, the Board must take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Wyndham from committing future violations. Additionally, any future resolutions to the Company's By-Laws or Articles of Incorporation should be put to a shareholder vote, and the following actions may be necessary to ensure proper Corporate Governance Policies:

a)   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations so that FTC rules and regulations are complied with;

b)   the creation of an officer-level position (that reports to the Board's Audit Committee) to monitor and implement new policies to ensure that the Company is complying with applicable rules and regulations and its information systems (including the security measures for those information systems) are appropriate and adequate;

c)   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

d)   a provision to permit the shareholders of Wyndham to nominate at least three candidates for election to the Board.

**Conclusion**

In making the foregoing demands to investigate and commence litigation, our client does not concede that the Board or any member thereof is disinterested, independent, or competent to consider these demands. Mr. Palkon, as a Wyndham shareholder, thanks you and the rest of the Board for your prompt attention to this serious matter. It is incumbent on the Board to hold accountable all those responsible for the harm done to the Company. Should you have any requests, questions, or concerns, please do not hesitate to contact me.

Sincerely,

Gregory E. Del Gaizo

cc: Richard A. Maniskas, Esq. (via e-mail)

# Exhibit B



Scott McLester<br>
EVP, General Counsel & Corporate Secretary

June 28, 2013

**Via UPS**

Gregory E. Del Gaizo, Esq.
Robbins Arroyo LLP
600 B Street
Suite 1900
San Diego, CA 92101

      **Re:** *Wyndham Worldwide Corporation Shareholder Litigation Demand*

Dear Mr. Del Gaizo:

I write in response to your June 11, 2013 letter to the Board of Directors of Wyndham Worldwide Corporation ("Wyndham"). I have provided your letter to Wyndham's Board, and it will be addressed by the Board in due course. As you know, in November 2012, the Board received a virtually identical letter from you on behalf of another purported Wyndham shareholder. The Board responded to that letter earlier this year.

While the Board is considering your most recent letter, I ask that you provide sufficient information to confirm Mr. Palkon's status as a Wyndham shareholder at the time the events underlying your demand occurred and/or when you sent your demand letter. Without information sufficient to show that Mr. Palkon was a Wyndham shareholder during the relevant time, we cannot conclude that he has standing to pursue a derivative demand. *See, e.g., Omnicare, Inc. v. NCS Healthcare, Inc.,* 809 A.2d 1163, 1169 n.11 (Del. Ch. 2002); *Richelsan v. Yost,* 738 F. Supp. 2d 589, 598-99, (E.D. Pa. 2010); *Smachlo v. Birkelo,* 576 F. Supp. 1439, 1444 (D. Del. 1983) (addressing demand letter's failure to provide the identity of the demanding shareholder and noting that "when the corporation requested more information from Nathan, he responded by filing suit instead of providing the requested information which he had a duty to do").

Nothing in this correspondence should be construed as any indication that there is agreement with your letter's statements, assertions, or characterizations. All rights are expressly reserved.

Regards,

Scott McLester
EVP, General Counsel & Corporate Secretary
Wyndham Worldwide Corporation

# Exhibit C



600 B Street, Suite 1900
San Diego, CA  92101
619.525.3990 *phone*
619.525.3991 *fax*
www.robbinsarroyo.com

July 3, 2013

**VIA E-MAIL & UPS GROUND**
scott.mclester@wyndhamworldwide.com

Scott McLester,
EVP, General Counsel &
Corporate Secretary
WYNDHAM WORLDWIDE CORPORATION
22 Sylvan Way
Parsippany, NJ 07054

Re:   **Wyndham Worldwide Corporation Shareholder Litigation Demand**

Dear Mr. McLester:

We are in receipt of your letter dated June 28, 2013, in response to our client Dennis Palkon's shareholder demand (the "Demand") on Wyndham Worldwide Corporation's ("Wyndham" or the "Company") Board of Directors (the "Board").  While we appreciate you providing Mr. Palkon's Demand to the Board, we disagree with your position regarding the proof Mr. Palkon must provide.  Your letter states that you "cannot conclude that [Mr. Palkon] has standing to pursue a derivative demand" because [he] purportedly did not provide you "information sufficient to show that he was a Wyndham shareholder during the relevant time." As we previously explained to you in our February 19, 2013 letter on behalf of another client, Daniel Himmel, you seem to conflate the standards for making a litigation demand upon a company with the requirements for a shareholder to have standing to sue derivatively.

As we explained in our February 19, 2013 letter, while a plaintiff is generally required to have continuous and contemporaneous ownership of a company's stock to pursue a derivative action on its behalf, there is no such requirement for a person to make a demand.  In fact, as explained in *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1240-41 (Del. Ch. 1987):

> [I]t makes little difference with respect to the board's duty … whether the information [in the demand] comes from a stockholder or from another and thus it makes little sense to think in terms of "entitlement to make a demand." … [W]hatever may be a board's duty in the circumstances of receiving a stockholder demand under Rule 23.1, that duty would not be materially different by reason solely of the fact that the information comes from a stockholder, a supplier or customer or even a busybody.

The premise in *Schick* was reinforced in the case, *Kautz v. Sugarman*, Nos. 10 Civ. 3478 (RJS), 10 Civ. 4312 (RJS), 2011 WL 1330676 (S.D.N.Y. Mar. 31, 2011).  In *Kautz*, the Court



explained that there is no requirement that a shareholder prove standing to pursue a derivative action at the time of making a demand. *Id.* at *6. Rather, the only requirements are that the shareholder identify himself and specify the misconduct that gives rise to the demand. *Id.* at *5-*6. Mr. Palkon did both of those things in his Demand. Under Delaware law, any purported "uncertainty that the board entertains concerning [Mr. Palkon's] fitness as a potential representative plaintiff … is … irrelevant to the exercise of the board's judgment now as to whether the Company's interest would likely be promoted by the taking of some action or of no action in response to [the Demand]." *Schick*, 533 A.2d at 1241.

The legal authority you cite for the contrary position, which is the same as you previously cited, remains unavailing. First, *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163 (Del. Ch. 2002) and the specific footnote you point to focus on standing to challenge a merger by filing a lawsuit. Mr. Palkon's Demand has nothing to do with challenging mergers nor does it equate to a lawsuit. The second case you cite, *Richelson v. Yost*, 738 F. Supp. 2d 589 (E.D. Pa. 2010) fails to consider controlling Delaware law. In fact, *Yost* relies upon the third and last case you cite, *Smachlo v. Birkelo*, 576 F. Supp. 1439 (D. Del. 1983), which predates the Delaware Chancery's decision in *Schick* by four years. More to the point, even *Smachlo* does not hold that a board's duty to investigate a shareholder demand is conditioned on proof the shareholder supplies showing that he would have standing to sue in the event his demand is refused; it merely holds that the individual making the demand must identify himself. *Smachlo*, 576 F. Supp. at 1444. As already explained, Mr. Palkon has done so.

Therefore, we decline to provide you with the information requested. This, however, should not be read in any way as an admission that Mr. Palkon does not have standing to bring a derivative action on behalf of Wyndham if the circumstances warrant. If at some time in the future you can articulate the relevance of providing the proof you requested to the Board, we will revisit our decision at that point.

Sincerely,

Gregory E. Del Gaizo

879784

# Exhibit D



Scott McLester
EVP, General Counsel & Corporate Secretary

August 20, 2013

Gregory E. Del Gaizo, Esq.
Robbins Arroyo LLP
600 B Street, Suite 1900
San Diego, CA 92101

**Re: Wyndham Worldwide Corporation Shareholder Litigation Demand**

Dear Mr. Del Gaizo:

I write in response to your July 3, 2013 letter. As you know, you sent a demand to the Board of Directors of Wyndham Worldwide Corporation ("Wyndham") on June 11, 2013. In that letter, you claimed that you represented a Wyndham shareholder—Dennis Palkon—and on that basis you asked Wyndham's Board to take certain actions. As discussed below, the Audit Committee and the Board have considered your letter and have determined that it is not in the best interests of Wyndham to pursue the claims outlined in your letter at this time.[1]

Your June 11, 2013 letter on behalf of Mr. Palkon is virtually identical to a letter you sent to Wyndham's Board on November 30, 2012 on behalf of another purported Wyndham shareholder, Daniel Himmel. The Audit Committee and the Board previously considered Mr. Himmel's demand in meetings held in February and March of this year. In a letter to you on March 15, 2013, I explained that the Audit Committee and the Board had determined that it was not in the best interest of Wyndham to pursue the claims outlined in the Himmel demand, and I explained the reasons for that decision. I have attached a copy of that letter for your reference.

The reasons why the Board decided not to cause Wyndham to pursue the claims outlined in the Himmel demand apply equally to the demand you have made on behalf of Mr. Palkon. As I explained in my March 15, 2013 letter, that decision was based on a number of considerations,

---

[1] On June 28, 2013, I asked you to provide sufficient information to confirm Mr. Palkon's status as a shareholder during the relevant time period. You have refused to provide that information. You do not claim any burden associated with that request, and, of course, there is little or no burden associated with producing information sufficient to confirm your client's status as an actual shareholder. You have nonetheless refused to provide any information regarding Mr. Palkon's status as a Wyndham shareholder. The law on this issue is clear: Where a person making a demand refuses to provide proof of stock ownership, the Board need not take any action in the response to the demand. Accordingly, given the limited burden and the significance of this issue, we still believe that you should provide evidence that Mr. Palkon was a Wyndham shareholder as of the relevant time. Notwithstanding the fact that it is unclear whether your client was or is in fact a Wyndham shareholder, both the Audit Committee and the full Wyndham Board have considered your letter and the demands made therein.

including the fact that (i) Wyndham has strong defenses to the FTC's allegations; (ii) commencing litigation against allegedly responsible individuals would impair Wyndham's defenses in the FTC's lawsuit; (iii) the claims contemplated are not yet ripe; (iv) there has been no material damage to Wyndham's shareholders as a result of the FTC's lawsuit or the conduct at issue in that lawsuit; and (v) there would be significant legal barriers to the claims contemplated by your letter.   In the view of the Board and the Audit Committee, those considerations continue to apply and counsel against pursuing the claims outlined in your letter at this time.

Since my March 15, 2013 letter, there have been no new developments with respect to the FTC's lawsuit which would warrant a different determination.  The only material change that has occurred is that the FTC's lawsuit was transferred from the U.S. District Court for the District of Arizona to the U.S. District Court for the District of New Jersey.  *See FTC v. Wyndham Worldwide Corp.*, 2013 WL 1222491 (D. Ariz. March 25, 2013).   That change, however, only further strengthens Wyndham's defenses to the FTC's claims given that Third Circuit law on certain key issues is more favorable to Wyndham than is the law in the Ninth Circuit—particularly with respect to the FTC's consumer-injury arguments.  *Compare Reilly v. Ceridian*, 664 F.3d 38 (3d Cir. 2011), *with FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010).

In light of the considerations outlined in my March 15, 2013 letter, and in light of the factual, practical, and legal barriers to any recovery, as well as the transfer of the FTC's lawsuit from Arizona to New Jersey, the Audit Committee and the Wyndham Board have determined that it is not in Wyndham's interests to pursue the claims contemplated by your June 11, 2013 demand letter at this time.  The Audit Committee and the Board will nevertheless continue to monitor the FTC's lawsuit.

Very truly yours,

Scott McLester
EVP, General Counsel, Corporate Secretary
& Chief Compliance Offer

Enclosure

# Exhibit E



# WYNDHAM
## WORLDWIDE

**Scott McLester**
EVP, General Counsel & Corporate Secretary

March 15, 2013

<u>**Via UPS**</u>

Gregory E. Del Gaizo, Esq.
Robbins Umeda, LLP
600 B Street, Suite 1900
San Diego, CA  92101

### Re:  Wyndham Worldwide Corporation Shareholder Litigation Demand

Dear Mr. Del Gaizo:

    I write in response to your February 19, 2013 letter.  As you know, you sent a demand to the Board of Wyndham Worldwide Corporation ("Wyndham") on November 30, 2012.  In that letter, you claimed that you represented a shareholder of Wyndham—Daniel Himmel—and on that basis you asked Wyndham's Board to take certain actions.  As discussed below, the Audit Committee and the Board have considered your letter at recent meetings and have determined that it is not in the best interests of Wyndham to pursue the claims outlined in your letter at this time.[1]

    As an initial matter, it bears mention that over the last several years, both the Board and the Audit Committee have devoted substantial attention to data security issues and to the dispute with the FTC.  Thus, the review by the Audit Committee and Board does not occur in a vacuum. In specific response to your letter, the Audit Committee reviewed the issues surrounding the Demand letter, including at its meeting on Feb. 27, 2013, and the Board was also briefed on the matter on February 28, 2013. In additional meetings on March 4, 2013 and March 11, 2013, respectively, the Audit Committee and the full Board further considered the matter. Based on this review, both the Audit Committee and the full Board have determined that it is not in

---

[1]   On January 29, 2013, I asked you to provide "sufficient information to confirm Mr. Himmel's status as a shareholder as of the relevant time." You have refused to provide that information. You do not claim any burden associated with the request. Of course, there is little or no burden associated with producing information sufficient to confirm your client's status as an actual shareholder. Nor do you claim otherwise. Instead, your only proffered reason for refusing to produce this information is that it is not "necessary." But the law on this issue is clear. Where a person making a demand refuses to provide proof of stock ownership, the Board need not take any action in the response to the demand. Accordingly, given the limited burden and the significance of this issue, we still believe that you should provide evidence that Mr. Himmel was a Wyndham shareholder as of the relevant time. Notwithstanding the fact that it is unclear whether your client was or is in fact a Wyndham shareholder, both the Audit Committee and the full Wyndham Board have considered your letter and the demands made therein.

**Wyndham Worldwide**
22 Sylvan Way, Parsippany, NJ 07054
ph (973) 753-6495   fax (973) 753-6496
scott.mclester@wyndhamworldwide.com

March 14, 2013
Page 2

Wyndham's best interests for the Board to cause Wyndham to pursue the claims outlined in your letter at this time. This decision is based on a number of considerations, including the following.

*First*, Wyndham has strong defenses to the FTC's allegations. Wyndham is not alleged to have violated any specific FTC regulation or rule, but is instead accused of violating the general provisions of Section 5 of the FTC Act. We contend that Section 5 does not give the FTC statutory authority to regulate the complex data-security systems of private companies. A number of third-parties--including the U.S. Chamber of Commerce, the Retail Litigation Center, the American Hotel & Lodging Association and the International Franchise Association--have supported Wyndham's legal position in filings with the federal court in Arizona. In any event, Wyndham responded to each cyberattack, including by notifying law-enforcement authorities, major payment-card brands, potentially affected consumers, and state regulatory offices. Wyndham also retained several expert computer forensic firms to analyze the cyberattacks and Wyndham's computer networks. Wyndham also developed and implemented significant remedial measures and data-security enhancements in the wake of the attack. In light of the large number of companies and governmental entities that have suffered cyberattacks in recent years, Wyndham's data security practices and responses to the cyberattacks were reasonable and Wyndham has strong legal and factual defenses to the FTC's lawsuit.

*Second*, the Audit Committee and the Board have concluded that commencing the litigation against allegedly responsible individuals as outlined in your letter would impair Wyndham's defenses in the FTC's lawsuit. *See, e.g., In re Merrill Lynch & Co., Inc. Securities, Derivative and ERISA Litigation*, 773 F. Supp. 2d 330, 348-49 (S.D.N.Y. 2011). The FTC would likely argue that Wyndham's assertion of such a claim constitutes an admission of liability by Wyndham, thus potentially undermining Wyndham's defenses in the FTC lawsuit.

*Third*, the claims contemplated by your letter are not yet ripe. Wyndham has not yet incurred any loss as a result of the FTC's lawsuit, and we believe that the FTC's claims will ultimately fail. Indeed, both the Audit Committee and the Board believe that Wyndham has strong defenses to the FTC's allegations. The case is in a very early stage. There has been no scheduling order entered for summary judgment or trial, there have been no depositions or expert submissions and the motion to dismiss has not even been ruled on. Before the FTC's lawsuit is resolved, it would be premature for the Board to take the "legal action" indentified by your letter.

*Fourth*, there has been no damage to Wyndham's shareholders as a result of the FTC's lawsuit or the conduct at issue in that lawsuit, and we do not foresee any such damage. Indeed, we contend that Section 5 of the FTC Act does not even allow the FTC to pursue damages in this litigation at all. Nonetheless, while the FTC's complaint alleges $10.6 million in losses, the FTC has not provided any damage demand at this point.

*Fifth*, there would be other significant legal barriers to a lawsuit as contemplated by your letter. To the extent your letter contemplates claims against Wyndham's Board or the Audit Committee, and only for that purpose, the Board considered the likelihood of recovering from Wyndham's Directors. In this regard, Wyndham's certificate of incorporation provides that "[n]o director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitations thereof is not permitted under the [Delaware General Corporation

March 14, 2013
Page 3

Law] as the same exists or may hereafter be amended."   In addition, Delaware courts have characterized a failure to supervise claim as "possibly the most difficult theory in corporate law upon which a plaintiff might hope to win a judgment."

In light of the considerations outlined in this letter, including among other things, the factual, the practical and the legal barriers to any recovery, the Audit Committee and the Wyndham Board have determined that it is not in Wyndham's interests to pursue the claims contemplated by your demand letter at this time.   The Audit Committee and the Board will nevertheless continue to monitor the FTC's lawsuit.

Very truly yours,

Scott McLester
EVP, General Counsel, Corporate Secretary
& Chief Compliance Officer

March 14, 2013
Page 4

Bcc:   Myra J. Biblowit
James E. Buckman
George Herrera
Stephen Holmes
The Right Honourable Brian Mulroney
Pauline D.E. Richards
Michael H. Wargotz
Eugene F. Assaf, Esq.

# EXHIBIT F

# [REDACTED]

# Exhibit G

 **ROBBINS ARROYO** LLP

600 B Street, Suite 1900
San Diego, CA 92101
619.525.3990 *phone*
619.525.3991 *fax*
www.robbinsarroyo.com

**VIA UPS GROUND**

Stephen P. Holmes,
Chairman and Chief Executive Officer
WYNDHAM WORLDWIDE CORPORATION
22 Sylvan Way
Parsippany, NJ 07054

>    Re:    **Wyndham Worldwide Corporation Shareholder Inspection Demand**

Dear Mr. Holmes:

As you are aware, we represent Dennis Palkon, a shareholder of Wyndham Worldwide Corporation ("Wyndham" or the "Company"). We write on our client's behalf to demand that the Company permit him to inspect certain books and records of Wyndham, pursuant to 8 Delaware General Corporation Law Code section 220 ("Section 220"). Pursuant to Section 220(b), our client has authorized Robbins Arroyo LLP to inspect the Company's books and records on his behalf.

Our client brings this demand for a proper purpose as required under Delaware law. His proper purpose is to evaluate the decision of the Wyndham Board of Directors (the "Board") to reject his June 11, 2013 litigation demand on August 20, 2013. For your convenience, the Board's letter informing our client of its decision is enclosed with this letter. Investigating a Board's decision to reject a litigation demand is a well-established proper purpose. *La. Mun. Police Emps. Ret. Sys. v. Morgan Stanley & Co.*, No. 5682-VCL, 2011 WL 773316, at *8 (Del. Ch. Mar. 4, 2011).

**SPECIFIC DEMANDS FOR INSPECTION**

In keeping with the proper purpose outlined above, our client demands to inspect the books and records specified below. In making this demand to inspect the Company's books and records, our client notes that his inspection demand must be construed as liberally and with as much latitude as is afforded under Delaware law. Our client intends that this demand cover any and all "books and records" in whatever form they take, to the fullest extent provided under Delaware's inspection demand jurisprudence. Further, the term "Wyndham" or the "Company" includes Wyndham's predecessors, successors, divisions, subsidiaries, officers, directors, employees, agents, or anyone acting or purporting to act on its behalf. All references to the "Board" in the requests below shall mean the Board of Wyndham. The term "Board" shall also include any persons acting on their behalf or in its stead, including, but not limited to, attorneys, accounting experts, investigators, agents, or similar proxies. In particular, our client demands to inspect:

>    1.    All meeting minutes of the Board or Board Committee where our client's litigation demand was discussed or evaluated;



*Wyndham Worldwide Corporation Shareholder Inspection Demand*
Page 2

2.    All meeting minutes of the Board or Board Committee concerning the potential appointment of a special committee tasked with investigating the allegations raised in our client's litigation demand;

3.    Any written report or presentation to the Board or Board Committee concerning our client's litigation demand;

4.    All documents reviewed or relied upon by the Board or Board Committee concerning our client's litigation demand;

5.    The engagement letters of any experts retained by the Board or Audit Committee concerning our client's litigation demand; and

6.    All document concerning the steps the Board and Company have taken in response to the broader concerns raised by our client's litigation demand, including measures to remedy certain improper and illegal business practices of the Company such as the apparent inadequate security measures instituted by the Company to purportedly protect its computer systems and its customers' personal information stored on those systems.

## CONCLUSION

The books and records sought have been described with reasonable particularity and directly relate to our client's proper purpose.  We request that you respond to this demand no later than five business days after its receipt, so that we may arrange a mutually convenient time and place for us to inspect the above-mentioned books, records, and minutes of Wyndham.  If you need more time to produce the requested books, records, and minutes, we are open to discussing a reasonable timeframe.  In addition, we are willing to enter into an appropriate confidentiality agreement covering the documents our client will inspect.  We appreciate your diligent attention to this matter.  If you have any questions, please do not hesitate to contact us.

Sincerely,

Gregory E. Del Gaizo

Enclosures
cc:  Richard A. Maniskas, Esq. (via e-mail)

890747

## LIMITED POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that Dennis Palkon does hereby make, constitute and appoint Robbins Arroyo LLP and Ryan & Maniskas, LLP, and any persons designated by them, to act as true and lawful attorneys in fact for him, in his name, place and stead, in all matters regarding the examination of Books and Records of Wyndham Worldwide Corporation and giving and granting unto said attorneys full power and authority to do and perform all and every act and thing whatsoever requisite necessary and proper to be done in and without the premises, as fully, to all intents and purposes as it might or could do, with full power of substitution and revocation, hereby ratifying and confirming all that its attorney or the substitute shall lawfully do or cause to be done.

IN WITNESS WHEREOF, I have hereunto set my hand as of Sept. 4, 2013.

_Dennis Palkon_
Dennis Palkon

## VERIFICATION

I, the undersigned, hereby by depose and state under oath that:

     1.     I am a stockholder of Wyndham Worldwide Corporation, as evidenced by the true and correct copy of my account statement attached hereto as Exhibit A.

     2.     I have read the demand letter made pursuant to 8 Del. C. § 220 addressed to Wyndham Worldwide Corporation and the statement of purpose and other statements therein contained are true and correct.

     I hereby verify under penalty of perjury that the foregoing statements made by me are true and correct.



Dennis Palkon

State of ___Florida___ )
                          ) SS
County of ___Palm Beach___ )

> **VIRGINIA HALE**
> MY COMMISSION # DD 932428
> EXPIRES: October 12, 2013
> Bonded Thru Notary Public Underwriters

     I, the undersigned, a Notary Public in and for the State of ___Florida___, do hereby certify that Dennis Palkon personally appeared before me, who being by me first duly sworn, does hereby depose and state under oath that he has read the foregoing demand and that the facts and statements therein contained are true and correct and that he acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument he executed the instrument.

     GIVEN under my hand and official seal of office this 4th day of September, 2013.

Virginia Hale

Notary Public

August 1, 2013 - August 31, 2013

**Customer Update:**

Open a no-annual-fee E*TRADE Retirement
Account today and get the tools, guidance and
value you need for your retirement.
Visit **etrade.com/retirement** for more information.

**E*TRADE Securities LLC**
P.O. Box 484
Jersey City, NJ 07303-0484
1-800-503-9260
etrade.com Member FINRA/SIPC

**E*TRADE Platinum**
**Complete Investment Account**

**IMPORTANT INFORMATION:**

**Ultimate Mobile Investing**
Connect seamlessly to your account and the
market with E*TRADE Mobile.
Visit **etrade.com/mobile** to learn more.

DENNIS S PALKON



**E*TRADE FINANCIAL**
Trading • Investing • Banking

WYNDHAM WORLDWIDE CORPORATION    WYN    885

TOTAL STOCKS, OPTIONS & ETF

PREFERRED STOCKS (0.00% of Holdings)

| DESCRIPTION | SYMBOL/ CUSIP | ACCT TYPE | QUANTITY | PRICE | TOTAL MKT VALUE | PORTFOLIO (%) | EST. ANNUAL INCOME | EST. ANNUAL YIELD (%) |
|---|---|---|---|---|---|---|---|---|
| ROCKY MOUNTAIN MINERALS INC $1.50 CV PFD | RMMIP | Cash | 30,000 | 0.0020 | 60.00 | 0.00 | | |
| TOTAL PREFERRED STOCKS | | | | | $60.00 | 0.00% | | |

FIXED INCOME (0.84% of Holdings)

# Exhibit H



**Scott McLester**
EVP, General Counsel & Corporate Secretary

September 18, 2013

Gregory E. Del Gaizo, Esq.
Robbins Arroyo LLP
600 B Street, Suite 1900
San Diego, CA 92101

**Re: Wyndham Worldwide Corporation Shareholder Litigation Demand**

Dear Mr. Del Gaizo:

    I write in response to your undated letter to Stephen P. Holmes, which Mr. Holmes' office received on September 12. Your letter, sent on behalf Dennis Palkon, seeks to inspect certain books and records of Wyndham Worldwide Corporation pursuant to Section 220 of Delaware's Corporation Code.

    Wyndham is consulting counsel regarding Mr. Palkon's inspection demand. We will substantively respond to this inspection demand promptly after we review the matter with our counsel.

                  Very truly yours,

                  Scott McLester
                  EVP, General Counsel, Corporate Secretary
                  & Chief Compliance Offer

# Exhibit I

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

WILLIAM M. LAFFERTY
302 351 9341
302 425 4679 FAX
wlafferty@mnat.com

September 26, 2013

## BY EMAIL AND BY FIRST CLASS MAIL

Gregory E. Del Gaizo
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101

Dear Mr. Del Gaizo:

I write in response to your September 12, 2013 letter (the "Demand") on behalf of Dennis Palkon, which demands access to certain books and records of Wyndham Worldwide Corporation ("Wyndham" or the "Company").

We object to your Demand insofar as it fails to comply with the statutory requirements of Section 220 of the Delaware General Corporation Law. Although the Demand includes a sworn statement that the Exhibit A is a "true and correct copy of [Mr. Palkon's] account statement," that is incorrect, because the statement is heavily-redacted and only pages 1 and 8 of 12 pages are included. 8 *Del. C.* § 220(b); *see Smith v. Horizon Lines, Inc.*, 2009 WL 2913887 (Del. Ch. Aug. 31, 2009) (finding that a heavily-redacted account statement merely showing name and stock ownership at an unknown time was insufficient proof of beneficial ownership). In addition, the portion of the statement relating specifically to Mr. Palkon's ownership interest in Wyndham is redacted such that it is impossible to determine the nature of his interest.

In addition, the account statement offered as proof of beneficial ownership at best shows only that Mr. Palkon held an unidentified interest in Wyndham as of August 2013. However, the documents sought in Requests 1-5 necessarily would include documents created at least between the time Mr. Palkon's litigation demand was sent on June 11, 2013 (the "Litigation Demand") and the time the Litigation Demand was rejected on August 20, 2013. The documents sought in Request 6 might conceivably include materials created years before that. Therefore, Mr. Palkon has not established that he was a stockholder at all relevant times.[1]

---

[1]   Moreover, Mr. Palkon cannot have a proper purpose in seeking documents regarding conduct before he became a shareholder, even if his stated purpose was simply to investigate wrongdoing (which it is not). Delaware law clearly provides that the stockholder must have

Gregory E. Del Gaizo
September 26, 2013
Page 2

Assuming that Mr. Palkon could establish that he was a stockholder at all relevant times, Request 6 is nevertheless improper because it is not narrowly tailored to the stated purpose of evaluating the Board's decision to reject his Litigation Demand.  Corporate wrongdoing is a "separate and distinct purpose" from evaluating demand refusal.  *Louisiana Munic. Police Empl. Ret. Sys. v. Morgan Stanley & Co.*, 2011 WL 773316, at *6 (Del. Ch. March 4, 2011).  These documents are not "necessary and essential" to determine the propriety of the Board's decision to reject the Litigation Demand.  *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002); *see Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561 (Del. Ch. 1998) (observing that the right to obtain documents for the purpose of evaluating demand refusal focuses on the board's process in refusing the Demand); *Louisiana Munic. Police Empl. Ret. Sys.*, 2011 WL 773316, at *9 (narrowly construing the documents to which a stockholder was entitled for stated purpose of investigating Demand refusal).  In any event, Request 6 seeks documents that are far too overbroad in scope regardless of Mr. Palkon's purpose in seeking them.  *See Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 565 (Del. 1997) (noting that Section 220 "is not an invitation to an indiscriminate fishing expedition.").

If Mr. Palkon can demonstrate that he meets the statutory requirements and the standing requirements imposed by Section 220, Wyndham would produce non-privileged documents responsive to Requests 1-5 (subject to an appropriate confidentiality agreement) to settle this matter.

This is an offer of compromise and settlement, and Wyndham reserves all of its rights, including the right to object to the Demand in its entirety, or to object to particular categories of documents requested by the Demand, if this offer is not accepted.

Wyndham reserves all of its rights concerning any future Section 220 demands.

Very truly yours,

William M. Lafferty

cc:     James P. Gillespie, Esq.
        Scott McLester, Esq.

---

held stock at the time of the alleged wrongdoing in order to state a proper purpose in such circumstances.  *West Coast Mgmt. and Capital LLC v. Carrier Access Corp.*, 914 A.3d 636, 642 (Del. Ch. 2006) (observing that a stockholder whose purpose is to investigate wrongdoing must be able to pursue the underlying derivative suit); *Graulich v. Dell Inc.*, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011) ("If plaintiff would not have standing to bring [a derivative] suit, plaintiff does not have a proper purpose to investigate wrongdoing because its stated purpose is not reasonably related to its role as a stockholder").  The documents sought in Request 6 of Mr. Palkon's Demand cannot be "reasonably related" to his status as a stockholder if he is unable ultimately to use them to challenge the alleged wrongdoing.

# Exhibit J



600 B Street, Suite 1900
San Diego, CA 92101
619.525.3990 *phone*
619.525.3991 *fax*
www.robbinsarroyo.com

September 30, 2013

**VIA E-MAIL & UPS GROUND**
wlafferty@mnat.com

William M. Lafferty, Esq.
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899

      **Re:   Wyndham Worldwide Corporation Shareholder Inspection Demand**

Dear Mr. Lafferty:

      We write in response to your letter dated September 26, 2013, concerning our client Dennis Palkon's shareholder inspection demand (the "Inspection Demand") on Wyndham Worldwide Corporation ("Wyndham" or the "Company").

      In your letter, you claim that our client did not comply with Delaware General Corporation Law Section 220's requirements because the documentary evidence we provided concerning Mr. Palkon's stock ownership, his brokerage statement, contains certain redactions and was not his entire brokerage statement. We disagree. The brokerage statement enclosed with the Inspection Demand included Mr. Palkon's full name, the number of shares he holds, and proof that he was a shareholder at the time of the Inspection Demand. That is all that is required under Section 220. The portions of the brokerage statement that were redacted or removed contained certain private and irrelevant information, such as his account number and other stock holdings. Section 220 contains no requirement that a shareholder provide such private or irrelevant information.

      Your reliance on *Smith v. Horizon Lines, Inc.*, CIV. A. 4573-CC, 2009 WL 2913887, at *2 (Del. Ch. Aug. 31, 2009) is misplaced. The brokerage statement in *Smith* did *not* show the owner's full name, but "merely showed that 'Smith' owned some type of [the company's] security at some unknown time." *Id.* Thus, the court found that "the heavily redacted page that *lacked the full name of the owner and the date of ownership* does not satisfy the 'documentary evidence' requirement." *Id.* Here, in stark contrast, the brokerage statement provided by Mr. Palkon includes both his full name, the date of ownership, and specifies the security at issue, Wyndham stock.

      Next, you allege that the Inspection Demand is improper because it does not include proof that Mr. Palkon was a shareholder "at least between the time [his] litigation demand was sent on June 11, 2013 (the 'Litigation Demand') and the time the Litigation Demand was rejected on August 20, 2013." You claim that "Delaware law clearly provides that the stockholder must



*Wyndham Worldwide Corporation Shareholder Inspection Demand*
September 30, 2013
Page 2

have held stock at the time of the alleged wrongdoing in order to state a proper purpose in such circumstances." This is an incorrect statement of the law. Indeed, Delaware courts have held that shareholders are entitled to inspect certain documents that predate the shareholders' first date of purchase. *See Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 916 (Del. Ch. 2007); *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002).[1]

Based on the above, we maintain that we have already provided you with the necessary documentary evidence of stock ownership by Mr. Palkon. Nonetheless, to hopefully avoid needless delay, we provide the attached brokerage statement showing that our client has been a stockholder since before the time that the litigation demand was sent. As we have already provided you with a brokerage statement showing that Mr. Palkon was a shareholder at the time of the Inspection Demand, we believe we have satisfied your request for proof that he was a shareholder between the time of the litigation demand and the Inspection Demand.

Further, although we disagree with your contentions concerning the propriety and scope of Request 6, without waiving our client's right to seek further responsive documents at a later

---

[1] Because our client's proper purpose is to find the reasons the Board of Directors rejected his litigation demand, a separate and distinct purpose from investigating facts for a derivative action, the actual date of his purchase of Wyndham stock is irrelevant. *Graulich* v. *Dell Inc.*, C.A. No. 5846-CC, 2011 WL 1843813, at *1 (Del. Ch. May 16, 2011) is consistent with our position. The plaintiff in *Graulich* stated that his sole purpose in pursing his inspection demand was to "initiate 'an appropriate suit' should he find evidence of wrongdoing," which the court took to mean a derivative action. *Id.* The plaintiff, however, could not bring a derivative action because, he lacked standing, his claims were time-barred, and they were barred by claim preclusion. *Id.* at *5-*7. Because *Graulich* could not bring the threatened suit, the court found that he lacked a proper purpose. *Id.* In reaching this conclusion, the court was careful to note that the plaintiff stated no other proper purpose. *Id.* at *7. ("To repeat, the **only** stated purpose in plaintiff's poorly-worded complaint is to pursue a possible derivative claim.") (emphasis in original). The court in *Graulich* noted that a shareholder can have proper purposes other than initiating a derivative action, and that it would have been a sufficient proper purpose if the plaintiff had more generally stated that he would "'take appropriate action' if it were found that the directors breached their duties." *Id.* (citing *Saito*, 806 A.2d 113; *Norfolk Cnty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, C.A. No. 3443-VCP, 2009 WL 353746 (Del. Ch. Feb. 12, 2009)). Since Mr. Palkon in no way limited his proper purpose to just filing a derivative action, and instead intends to take appropriate action based on the documents he reviews, *Graulich* actually supports the proposition that the actual date Mr. Palkon purchased stock is irrelevant.

*Wyndham Worldwide Corporation Shareholder Inspection Demand*
September 30, 2013
Page 3

date, we accept your offer to produce non-privileged documents responsive to Requests 1-5.  For those documents you withhold on the basis of privilege, we ask that you provide an appropriate log.

Sincerely,

*Gregory E. Del Gaizo/*
*w/permission LK*

Gregory E. Del Gaizo

Enclosure

cc:     Richard A. Maniskas, Esq. (via e-mail)

899219

May 1, 2013 - May 31, 2013
Account Number:    XXXX-6557
Account Type:      INDIVIDUAL

E*TRADE Securities LLC
P.O. Box 484
Jersey City, NJ 07303-0484
1-800-503-9260
etrade.com Member FINRA/SIPC

**IMPORTANT INFORMATION:**

**Ultimate Mobile Investing**
Connect seamlessly to your account and the market with E*TRADE Mobile.
Visit **etrade.com/mobile** to learn more.

**Customer Update:**

Open a no-annual-fee E*TRADE Retirement Account today and get the tools, guidance and value you need for your retirement.
Visit **etrade.com/retirement** for more information.

DENNIS S PALKON, PHD

E*TRADE Platinum
Complete Investment Account

E*TRADE
FINANCIAL
Trading · Investing · Banking





# E✳TRADE
## FINANCIAL
Trading  •  Investing  •  Banking



### E✳TRADE Platinum
#### Complete Investment Account

**Account Number:** XXXX-6557

**Statement Period :** May 1, 2013 - May 31, 2013

**Account Type:** INDIVIDUAL

## ACCOUNT HOLDINGS
### STOCKS, OPTIONS & EXCHANGE-TRADED FUNDS (99.17% of Holdings)

| DESCRIPTION | SYMBOL/CUSIP | ACCT TYPE | QUANTITY | PRICE | TOTAL MKT VALUE | PORTFOLIO (%) | EST. ANNUAL INCOME | EST. ANNUAL YIELD (%) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

E*TRADE Securities LLC • PO Box 484, Jersey City, NJ 07303-0484 • www.etrade.com • 1-800-503-9260 • Member FINRA/SIPC



# E✱TRADE
# FINANCIAL
Trading • Investing • Banking

## E✱TRADE Platinum
## Complete Investment Account

Account Number: XXXX-6557

Statement Period : May 1, 2013 - May 31, 2013

Account Type: INDIVIDUAL

## STOCKS, OPTIONS & EXCHANGE-TRADED FUNDS (Continued)

| DESCRIPTION | SYMBOL/ CUSIP | ACCT TYPE | QUANTITY | PRICE | TOTAL MKT VALUE | PORTFOLIO (%) | EST. ANNUAL INCOME | EST. ANNUAL YIELD (%) |
|---|---|---|---|---|---|---|---|---|
| WYNDHAM WORLDWIDE CORPORATION | WYN | Margin | 885 | 58.1200 | 51,436.20 | 0.90 | 1,027.00 | 2.00% |

# Exhibit K

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

WILLIAM M. LAFFERTY
302 351 9341
302 425 4679 FAX
wlafferty@mnat.com

October 15, 2013

**BY EMAIL AND FIRST CLASS MAIL**

Gregory E. Del Gaizo, Esquire
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, California  92101

Dear Mr. Del Gaizo:

Thank you for your September 30, 2013 letter, to which I write in response.

Although we disagree with your contention that the two brokerage statements attached to your September 12 and 30 letters "satisfied [our] request for proof that [Mr. Palkon] was a shareholder between the time of the litigation demand and the Inspection Demand," we believe the parties can readily resolve this issue.  We agree that the brokerage statement attached to your September 30 letter evidences Mr. Palkon's beneficial ownership of Wyndham stock as of May 2013.  However, that statement does not provide any proof of beneficial ownership for the months of June (when the Litigation Demand was made), July, and August (when the Litigation Demand was rejected).[1]  We believe such proof is necessary, and disagree with your readings of *Melzer* and *Saito*.  To resolve this issue, and given the light burden of redacting three months of brokerage statements, we request that Mr. Palkon provide brokerage statements for June, July and August in the same form and with similar redactions as the brokerage statement provided for May.

Assuming that you will provide the requested brokerage statements, Wyndham will produce non-privileged documents responsive to Requests 1-5, and will provide a privilege

---

[1]    The August brokerage statement that you previously provided was redacted in such a way that we could not, for example, determine the nature of the interest in Wyndham that Mr. Palkon held.

Gregory E. Del Gaizo, Esquire
October 15, 2013
Page 2


log for those documents we withhold on the basis of privilege, upon receipt of a signed revised confidentiality agreement in the form enclosed.  We reserve all of our rights in connection with Mr. Palkon's Request 6, which we continue to believe is improper.


Very truly yours,

William M. Lafferty

WML/rkr
Enclosure
cc:     James P. Gillespie, Esquire, Kirkland & Ellis
        Scott McLester, Esquire, Wyndham Worldwide Corporation